AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

MONIQUE LYNN GUERRERO,
    Defendant.

Case No. 2:24-mj-05874-DUTY

LODGED
CLERK, U.S. DISTRICT COURT
SEP 26 2024
CENTRAL DISTRICT OF CALIFORNIA
BY: rsm DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
9/26/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: CGM DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about September 25, 2024, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Mark Williams, SA Homeland Security Investigations
*Complainant's signature*

Mark Williams, SA Homeland Security Investigations
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: September 26, 2024

Joel Richlin
*Judge's signature*

City and state: Los Angeles, California

Hon. A. Joel Richlin, U.S. Magistrate Judge
*Printed name and title*

AUSA: Alexandra Michael (x3756)

**AFFIDAVIT**

I, Mark Williams, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Monique Lynn GUERRERO ("GUERRERO") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute Methamphetamine.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (the "SUBJECT DEVICES"), in the custody of Homeland Security Investigations ("HSI") in El Segundo, California, as described more fully in Attachment A: one blue Motorola smartphone, seized from GUERRERO's pink carryon bag ("SUBJECT DEVICE 1"); and one white HP laptop, seized from GUERRERO's pink carryon bag ("SUBJECT DEVICE 2").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to possess with the intent to distribute controlled substances), 21 U.S.C. § 953(a) (unlawful exportation of controlled substances), 21 U.S.C. § 960 (knowing exportation of a controlled substance), and 18 U.S.C. § 554 (knowing exportation of any merchandise contrary to any law) (the "Subject Offenses"), as described more

fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5. I am a Special Agent ("SA") with HSI and have been since January 2024. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. In the course of my work, I have conducted physical surveillance, executed arrest warrants, and reviewed electronic records.

6. At the Federal Law Enforcement Training Center, I completed the Criminal Investigator Training Program with 480 hours of training, and the HSI Special Agent training with another 480 hours of training. Prior to becoming a federal law enforcement officer, I was a Maryland Transportation Authority

Police Officer for five years. I completed a state-level academy with 1,280 hours of training. Furthermore, I was a member of the Civil Disturbance Unit with over 80 hours of additional training, and a member of the Honor Guard Unit with over 200 hours of additional training. I hold an Associate's Degree in General Studies from the Community College of Baltimore County.

### III. SUMMARY OF PROBABLE CAUSE

7.  On September 24, 2024, at approximately 9:25 p.m.,[1] GUERRERO arrived in Los Angeles Airport ("LAX") from San Jose, California Airport ("SJC") with one pink carryon bag, one small white purse, and two black hard-sided suitcases (which she had checked in SJC that were also in transit through LAX), and attempted to fly from LAX to Sydney, Australia. During a secondary border screening of GUERRERO's luggage, United States Customs and Border Protection Officers ("CBPOs") scanned GUERRERO's checked luggage with a drug detection K9, who alerted positively for the presence of narcotics.

8.  CBPOs then scanned the two bags through a mobile X-Ray, which revealed anomalies within both bags. Upon further inspection, the suitcases both contained many black t-shirts with packages rolled up in them, with numerous Clorox wipes spread throughout. Upon looking through the t-shirts there were many vacuum-sealed bags containing a white, crystalline substance. There were 21 vacuum-sealed bags total between the two suitcases. The total weight of the crystalline substance

---

[1] All times herein are approximate and are Pacific time.

with the vacuum-sealed bags included was approximately 40.96 kilograms. The substance field tested positive for methamphetamine.

9. During the examination, GUERRERO told the CBPOs that she was on her way to a vacation in Australia, and claimed ownership of her carryon bags and both black hard-sided suitcases.

10. In GUERRERO's small white purse, CBPO Ventrice also discovered the tickets for her flight from San Jose to LAX, and from LAX to Sydney, Australia. In addition, there was a receipt that showed GUERRERO used her own credit card to pay an overweight luggage fee of $300 for her checked bags. Both bags were overweight: one bag was 61 pounds, and one bag was 63 pounds. The permitted weight for checked luggage is 50 pounds per bag.

### IV. STATEMENT OF PROBABLE CAUSE

11. On September 24, 2024, GUERRERO attempted to travel from SJC to LAX to Sydney Airport ("SYD") in Australia via Delta Airlines. The initial portion of her trip was on Delta Airlines flight DL 3883 from SJC to LAX which landed at LAX at approximately 9:25 p.m.

12. Based on my conversations with CBPO Aguirre and other CBPOs, I know that at approximately 10:30 p.m. on September 24, 2024, GUERRERO was selected for a secondary inspection by CBPOs before her outbound flight from LAX to Sydney, Australia, based

on her travel pattern matching up to recent narcotics trafficking trends.

13. GUERRERO had checked in two overweight black hard-sided suitcases that were tagged to Sydney Australia, with GUERRERO's name on both tags. Both black hard-sided suitcases were screened by a drug detection K9 handled by CBPO Miramontes. K9 Ares positively alerted to both suitcases.

14. The bags were then screened through a mobile X-Ray van, where CBPO Pasilong observed anomalies. CBPO Aguirre opened and searched both suitcases and found multiple black vacuum sealed packages.

15. At approximately 10:47 p.m., the baggage examination revealed 21 vacuum sealed packages with white crystalline substance. At 11:07 p.m., CBPO Aguirre (witnessed by CBPO Mechishchev) performed a preliminary drug test on the substance, which yielded positive results for methamphetamine. The total weight of the methamphetamine (including packaging of the vacuum-sealed bags) was approximately 40.96 kilograms.

 

16. GUERRERO was contacted in the jetway at Gate 31A attempting to board Delta Airlines flight DL 41 (LAX to SYD) by CBPO Aguirre. GUERRERO stated she was traveling alone and would spend two weeks in Australia for vacation. GUERRERO was offloaded and transported to the Federal Inspection Service area at the LAX Thomas Bradley International Terminal for further examination. GUERRERO stated to CBPO Aguirre that both black hard-sided suitcases and her carryon bags belonged to her.

17. Earlier on September 24, 2024, at SJC Airport, GUERRERO had used her own credit card to pay a total $300 overweight luggage fee for both of her checked bags. One checked bag weighed 61 pounds, and the other bag weighed 63 pounds. Each checked bag had a tag with her name on it, and her receipt of payment was in her white purse, along with both of her flight tickets. The white purse was on her person, and the receipt and tickets were found by CBPO Ventrice.

  

18. At approximately 11:48 p.m. on September 24, 2024, I responded to the Customs and Border Protection baggage check area at the Tom Bradley International Terminal at LAX, and took custody of and inspected GUERRERO's bags. I also took photographs of both of GUERRERO's black hard-sided suitcases, her boarding passes, the checked luggage tags on her black hard-sided suitcases, and the suspected methamphetamine that was discovered in her black hard-sided suitcases.

19. Based on my conversations with CBPO Aguirre and CBPO Mechishchev, I know that CBPO conducted a Gemini Chemical Identification Analysis test on the white crystalline substance discovered inside both of GUERRERO's black hard-sided suitcases. The substance tested positive for the presence of methamphetamine.

20. The total approximate weight of the methamphetamine (including packaging) was 40.96 kilograms. Based on my training

and experience investigating narcotics offenses, this quantity of methamphetamine is consistent with distribution, not mere personal use. I learned from an Australian Border Force Task Force Officer that the estimated value of the methamphetamine in Australia, is believed to be in excess of $4 Million in U.S. dollars.

21. One blue Motorola smartphone was found and seized from GUERRERO's pink carryon bag ("SUBJECT DEVICE 1"); and one white HP laptop was found and seized from GUERRERO's pink carryon bag ("SUBJECT DEVICE 2").

### V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

22. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained

where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

      c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

23. As used herein, the term "digital device"[2] includes the SUBJECT DEVICES.

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

24.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable

---

paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

 25. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

   a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    26.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

    27.   For all of the reasons described above, I submit that there is probable cause to believe that GUERRERO has committed a violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute methamphetamine). I further submit that there is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant
in accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
26th day of September, 2024.

_____
HONORABLE A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE